Appleton Electric Company, an Illinois Corporation v. Commissioner.
Appleton Electric Co. v. Commissioner
Docket No. 5922-64.
United States Tax Court
T.C. Memo 1967-211; 1967 Tax Ct. Memo LEXIS 49; 26 T.C.M. (CCH) 1043; T.C.M. (RIA) 67211; October 27, 1967
Jay A. Canel, for the petitioner. William J. Gerard, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the fiscal years ended July 31, 1955, and July 31, 1956, in the amounts of $8,151.47 and $164,403.68, respectively. The deficiency for the fiscal year ended July 31, 1955, except that portion due to certain agreed adjustments, and a part of the deficiency for the fiscal year ended July 31, 1956, result from a disallowance in each of these years of a portion of the net operating loss deductions claimed in petitioner's application for net operating loss carry-back adjustments *50 to these years from the fiscal year ended July 31, 1958. The sole issue for decision is whether in each of the fiscal years ended July 31, 1956 and July 31, 1958, amounts paid by petitioner to its president in excess of $100,000 are reasonable compensation deductible as an ordinary and necessary business expense. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of Illinois with its principal office at the time the petition in this case was filed in Chicago, Illinois. Petitioner filed its Federal corporate income tax returns for the fiscal years ended July 31, 1955, July 31, 1956, and July 31, 1958, with the district director of internal revenue at Chicago, Illinois. During each of the years here in issue petitioner's president and chief executive officer was Arthur I. Appleton (hereinafter referred to as Arthur). Arthur is the son of Albert I. Appleton (hereinafter referred to as Albert) who was the founder of petitioner and the owner of a majority of petitioner's stock until sometime in 1947 or 1948. Arthur received an A.B. degree from Dartmouth College in 1933 and during his last year *51 attended Amos Technical School in Business Administration and Finance. After Arthur's graduation, his father took him on a trip and upon returning toward the end of July 1936, Arthur entered petitioner's plant and worked on various machines such as turret lathes, punch presses, and gasket cutters for approximately a year. After spending a year acquainting himself with the various operations of the plant, Arthur assumed other duties with petitioner such as labor negotiations and executive duties. He continued in petitioner's employ until going into the United States Navy in 1943. He entered the Navy as a Lieutenant Junior Grade and got a spot promotion to a full Lieutenant. Just prior to entering the Navy, Arthur had applied for a patent on an invention dealing with placing terminal tubes on junction boxes in such a manner as to make them completely watertight. Arthur gave this patent to the Navy and he made several of the tools which were used to attach the terminal tubes covered by his patent to the junction boxes and presented these tools to the maintenance and production workers at the various Navy yards. While in the Navy, Arthur established an inventory control system for *52 the Oakland Supply Depot and he received a letter of commendation for the work he did in that connection. At the time he went into the Navy Arthur had several other patents besides the one which he gave to the Navy. Arthur was released from the Navy in late 1945 and returned to work for petitioner. Sometime prior to entering the Navy Arthur had been given the title of vice president by petitioner. In 1940 Arthur and Walter Glass (hereinafter referred to as Glass) had formed a company known as the Leader Electric Company (hereinafter referred to as Leader Electric) in which they each owned 50 percent of the stock. Arthur and Glass had each invested $15,000 in Leader Electric when it was formed. Arthur had viewed his interest in Leader Electric primarily as an investment. He had no administrative duties in connection with Leader Electric and the only time he gave to the operation of that business was in the evenings and on Sundays when he would give advice with respect to its operations. When Arthur resumed his work with petitioner in late 1945, he still maintained his interest in Leader Electric. Even though Arthur was working on a full-time basis for petitioner, his father was *53 unwilling for him to continue his interest in Leader Electric although that company did not compete with petitioner directly. In mid-1946 Albert offered Arthur the choice of giving up his stock ownership in Leader Electric and devoting his full time and thinking outside of business hours to petitioner rather than to another corporation or of going to work on a full-time basis for Leader Electric. Arthur decided to stay with petitioner and his father, Albert, negotiated with Glass for the sale of Arthur's stock in Leader Electric to Glass for $50,000 plus a piece of land which Leader Electric had acquired for $15,000. These negotiations and the purchase by Glass of Arthur's interest in Leader Electric occurred in 1946. In 1953 Glass sold Leader Electric to another electric company for $1,000,000 and the retention by Glass of the real estate, certain patents, and a Gas Station Lighting Division of the business which Glass subsequently sold to another company. After Arthur's sale of his stock in Leader Electric to Glass, petitioner on July 8, 1946, entered into the following contract with Arthur: WHEREAS, the party of the second part is now in the employ of the party of the first *54 part as Executive Vice President and General Manager and has been so engaged for a number of years last past, and WHEREAS, during said employment said party of the second part has acquired information concerning the conduct and management of said business and is familiar with its operations and during his said employment has created certain inventions by which the Company has benefited and will continue to benefit, and WHEREAS, said second party is endeavoring to perfect certain ideas which may result in his obtaining patents on certain products to be made and handled by the Company, and WHEREAS, the Company is desirous of retaining the services of said second party in order to continue to reap the reward his efforts and inventions may produce, and is likewise desirous of having the benefit of his knowledge and experience heretofore acquired in the conduct of the Company's affairs, IT IS THEREFORE AGREED, as follows: The party of the first part hereby covenants and agrees and by these presents does employ the party of the second part as its general superintendent and general manager of its entire business for a period of twenty-five (25) years from the date hereof, and said *55 second party covenants and agrees that he will enter into said employment and by these presents does enter into the employment of the second party for said period and agrees that during the term of this agreement he will devote his entire time and energy to the furtherance of the business of the first party under its direction, and said second party agrees that during said time he will endeavor to create and develop certain patented devices to be manufactured by the Company as well as endeavor to make improvements upon articles heretofore created and developed by him, and will at all times act for the best interests of said Corporation. IT IS FURTHER UNDERSTOOD AND AGREED that said second party will at all times confer and advise with the said Board of Directors of said Corporation in all matters pertaining to the conduct of its business and will not during the term of this agreement do any act or thing that might be a detriment to said Company. Said first party agrees to pay to said second party as compensation for his services in the various capacities in which he may be employed the sum of Seventy-Five Thousand Dollars per year payable in semi-monthly, monthly or quarterly installments *56 as the parties may from time to time agree upon, less Social Security, Withholding Tax, etc., Said first party covenants and agrees to pay said second party in addition to said sum of Seventy-Five Thousand Dollars ($75,000.00) a further sum equal to two percent (2%) of total net sales of said Company each year over and above Seven and One Half Million Dollars ($7,500,000.00) of net sales, said latter sum to be paid to said second party upon the determination of said net sales of said Company and as such time as the parties hereto shall agree upon and as will be most convenient for the Company. Prior to the time that this contract of July 8, 1946, was entered into between Arthur and petitioner, Arthur's salary from petitioner had been $75,000 per year. Petitioner's net sale for the calendar years 1945, 1946, and 1947 were $7,714,685, $8,801.352, and $14,575,530, respectively. On July 8, 1946, when petitioner and Arthur entered into the agreement for his employment, petitioner's father, Albert, owned 51.6 percent and Arthur owned 13 percent of petitioner's outstanding stock. On September 30, 1947, a supplementary agreement was entered into between petitioner and Arthur which *57 provided as follows: WHEREAS, the party of the Second Part hereto on the 8th day of July, A.D. 1946 executed a contract of employment whereby among other things said Second Party was employed as General Manager, etc., to operate and manage the business of the Party of the First Part, and WHEREAS, at the time of the execution of said contract said Second Party was Executive Vice President of said company and has since been made President thereof, and WHEREAS, the APPLETON ELECTRIC COMPANY has purchased certain assets and the business of the GOODRICH ELECTRIC COMPANY, an Illinois Corporation (but not its corporate structure), and WHEREAS, said contract of July 8, 1946 provides for compensation to be paid to said Second Party plus a certain percentage of the sales in excess of a stated amount, and WHEREAS, the business of the GOODRICH ELECTRIC COMPANY is now being conducted by the APPLETON ELECTRIC COMPANY designated as the GOODRICH DIVISION, and WHEREAS, at the time of the execution of said contract of July 8, 1946 no provision was made in the event the Company acquired the entire business of another operating company with reference to the inclusion or exclusion of the sales *58 of said newly acquired business insofar as computing the compensation to be paid to said Second Party on a percentage basis is concerned, and WHEREAS, the parties hereto desire that a certain amount of the sales of the GOODRICH DIVISION OF THE APPLETON ELECTRIC COMPANY be excluded from the arrangement of July 8, 1946 in computing the percentage compensation of said Second Party hereafter, proportionately for the year 1947, and thereafter as herein set forth. IT IS THEREFORE AGREED AS FOLLOWS: That the contract of July 8, 1946, shall be modified and changed so that the percentage compensation to be paid to said Party of the Second Part shall be figured on the net sales in excess of $7,724,000.00 for the year 1947; and thereafter in excess of $8,172,000.00, and that said net sales shall be determined by first deducting all credits, returns and discounts, during the period said contract of July 8, 1946 is to continue. IT IS FURTHER UNDERSTOOD AND AGREED that said contract of July 8, 1946 is modified and changed as herein stated only, and except as so modified shall remain and continue in full force and effect for the period set forth in said contract of July 8, 1946. IT IS FURTHER *59 UNDERSTOOD AND AGREED between the parties that in the event the Party of the First Part shall hereafter acquire the entire business of or any other operating company of individuals, co-partners or corporation or association during the term of said agreement of July 8, 1946, that proper provisions will be made insofar as the compensation of the Party of the Second Part is concerned by adjusting the total sales of the Company before the percentage provision is to apply. No dividends have been paid by petitioner since 1948. On February 1, 1952, petitioner entered into an agreement with The National City Bank of New York and six insurance companies whereby petitioner contracted to borrow a maximum of $3,000,000; $1,500,000 from the bank, repayable in annual installments of $300,000 commencing February 1, 1953, and $250,000, but not less than $125,000, from each of the six insurance companies repayable in five equal annual installments commencing on the first day of February 1958. The loan agreement executed by petitioner with the bank and the insurance companies provided the following with respect to dividends: The Corporation will not declare or pay any dividends (other than stock *60 dividends) on the stock of any class of the Corporation, purchase, redeem or otherwise acquire for value its stock of any class now or hereafter outstanding, return any capital to its stockholders or make any distribution of its assets to its stockholders in excess of an amount equal to sixty-six and two-thirds percent (66 2/3%) of the net earnings of the Corporation available for dividends arising subsequent to December 31, 1951, and then only if after giving affect to such dividends, purchase, redemption, acquisition, return of capital or distribution, the total of cash and receivables, less the total amount of current liabilities of the Corporation, will be at least equal to 125% of the Funded Debt of the Corporation. At the end of the years here in issue the total of cash and receivables less current liabilities of petitioner was not equal to 125 percent of the funded debt and, therefore, on the basis of the provision of the loan agreement with respect to dividends no dividends other than a stock dividend could be paid by petitioner. At the time of the trial of this case Arthur had been issued 76 patents individually and an additional 8 patents in conjunction with other inventors. *61 During its fiscal years ended July 31, 1955, through July 31, 1960, petitioner manufactured products under 21 of the patents held by Arthur. One of petitioner's product lines, "Sealtite" is manufactured almost entirely from components which are items on which Arthur obtained patents. Petitioner began the manufacture of Sealtite in 1952. During its fiscal years 1955 through 1960, petitioner's gross sales of the Sealtite products were approximately $8,887,000, its gross profit approximately $5,637,000, and its net profit before taxes on this line during this 6-year period was approximately $3,491,000. The following shows, for the fiscal years ended July 31, 1955 through July 31, 1960 the approximate amount of petitioner's gross sales of products manufactured under Arthur's patents and the gross profit of petitioner from such sales: Fiscal year
ended
Gross profit on
July 31
Gross sales
such sales
1955
$2,721,880
$1,262,065
1956
3,830,339
1,812,397
1957
3,845,027
1,827,092
1958
3,315,099
1,380,759
1959
4,952,769
2,251,689
1960
5,387,433
2,582,500
During its fiscal years ended July 31, 1955 through July 31, 1960, petitioner's total gross sales *62 and gross profits were as follows: Fiscal year
ended
July 31
Gross sales
Gross profit
1955
$19,466,462
$5,524,887
1956
22,437,799
5,668,461
1957
21,216,965
4,446,832
1958
19,505,111
3,850,064
1959
22,596,724
5,903,902
1960
22,046,889
5,758,159
The approximate sales of the various products manufactured by petitioner under Arthur's patents during its fiscal years ended July 31, 1955, through July 31, 1960, segregated by products were as follows: All other
Fiscal year ended
patented
July 31
Sealtite
V51
UNY
Locknut
products
1955
$ 933,212
$33,360
$324,251
$292,095
$1,138,962
1956
1,422,282
30,280
404,645
372,390
1,600,742
1957
1,763,146
32,705
340,778
266,022
1,442,376
1958
1,251,658
35,838
334,448
275,122
1,418,033
1959
1,526,666
40,343
328,278
305,159
2,752,323
1960
1,990,016
41,150
302,824
326,083
2,727,360
Arthur's various patents used by petitioner are of a type which could be licensed to other manufacturers on a royalty basis. Royalties paid by companies for patents in the electrical products field range from approximately 2 to 10 percent of sales *63 depending upon a number of factors. One of the factors to be considered is whether the license is exclusive or nonexclusive, an exclusive license carrying a higher rate than a nonexclusive. Another factor to be considered is whether there are any restrictions on the license either in the extent to which it may be used or territorial restrictions or period of time. The fewer restrictions on a license, the higher, usually, the royalty rate. Another factor to be considered is the anticipated profit from the manufacture of the item under the patent since the higher the profit percentage the more likely a high royalty would be considered. The most commonly used royalty for patents in the field of manufacture of electrical fixtures and related items is 5 percent. A 2 percent royalty is on the low side and a 10 percent royalty is on the high side. Petitioner's Sealtite products, which it manufactured under Arthur's patents, were manufactured exclusively by petitioner, and there were no limitations on petitioner's right to make use of and sell the products manufactured under these various patents. Petitioner was the only user of the other of Arthur's patents which related to products manufactured *64 by petitioner. During each of the fiscal years ended July 31, 1955, 1956, and 1958 Arthur was president and acting chairman of the board of petitioner. He had the general direction of petitioner and he reviewed all of its policies with reference to sales and manufacturing. In addition Arthur spent substantial time in petitioner's engineering department. Arthur also spent evenings working in connection with his inventions for petitioner. Very often Arthur will awaken at 2:00 or 3:00 o'clock in the morning with an idea of an invention and will make drawings or notes to use later in determining whether the idea can be developed. Arthur will examine a competitor's product and attempt to determine whether he could invent a product for petitioner to make that would be more efficient for the purpose for which it is used than the product manufactured by the competitor. Often he is able to invent and patent a competitive product. A number of distributors of electrical products and contractors who use these products in building houses and buildings in the Chicago area will specify products manufactured by petitioner from Arthur's patents because they have found these products to be more *65 satisfactory than other products they have used. At times the distributors will purchase and the contractors will specify in their building plans the use of petitioner's products manufactured from Arthur's patents even when such products have a price differential of as much as 15 percent higher than a competitor's products which lack the patented feature which the particular contractors think valuable or the particular distributor thinks will make the products more salable. Petitioner had earned surplus and undivided profits of $11,246,347.01, $11,963,284.90 and $9,983,540.64 for the fiscal years ended July 31, 1955, 1956, and 1958, respectively. Substantially all of petitioner's surplus was in buildings, inventories, and equipment used in petitioner's business. During the fiscal years ended July 31, 1955, 1956, and 1958 the compensation of petitioner's officers was as follows: Fiscal year ended July 31
Name
Title
1955
1956
1958
Arthur I. Appleton
President [1]
$256,718.54
$289,843.49
$261,791.34
I. W. Strong
Exec. Vice Pres. [2]
18,750.00
28,075.00
30,100.08
F. W. Wehrheim
Vice-Pres.
22,500.00
28,075.00
28,600.00
W. H. Schroeder
Treasurer
12,666.72
17,308.35
17,800.08
K. O. Schneider
Vice-Pres.
18,100.08
E. V. Aldridge
Asst. Vice-Pres
8,791.76
16,750.08
M. E. Schreiber
Secretary
11,400.00
11,400.00
11,400.00
$322,035.26
$383,493.60
$384,541.66
*66 The following schedule shows the salaries paid to the 25 highest paid employees included in petitioner's pension plan for the calendar year 1947 and for the fiscal year ended July 31, 1957 No.
Name
Year 1947
FY 7-31-57
Name
1.
Arthur I. Appleton
$132,307.25
$278,729.65
Arthur I. Appleton
2.
Whitfield, M.
78,000.00
25,200.00
Strong, I. W.
3.
Schlobaum, H.
54,500.00
25,200.00
Wehrheim, F. W.
4.
Appleton, J.
27,000.00
16,300.00
Hakenson, E. A.
5.
Herbert, H.
25,000.00
16,200.00
Schneider, K. O.
6.
Tornblom, N.
24,753.26
15,600.00
Schroeder, W. H.
7.
Hawks, J.
24,180.00
15,415.86
Darby, R. E.
8.
Rockwell A.
19,700.00
15,000.00
Maloney, J. S.
9.
Werheim, F.
19,500.00
15,000.00
Appleton, N. A.
10.
Gerstenberger, A.
19,032.61
14,875.02
Aldridge, E. V.
11.
Robertson, W.
16,660.00
14,400.00
Schaper, R. N.
12.
Callan, N.
16,200.00
14,200.39
Bell, J. O., Jr.
13.
Bloom, C.
15,560.00
12,828.28
Buegel, H. A.
14.
Whitfield, J. E.
15,180.00
12,731.52
McNeill, R. A.
15.
Schreiber, M.
13,800.00
12,674.66
Greer, Z. B.
16.
Hakanson
13,180.00
12,600.00
Robertson, W. A.
17.
Darby, R.
12,320.00
12,451.15
White, H. T.
18.
Appleton, H.
12,226.09
12,000.00
Hedberg, R.
19.
Blum, R.
12,031.36
12,000.00
Mauritzen, M. J.
20.
Ledig, F.
11,380.00
12,000.00
Meyer, I.
21.
Buchicchio, D.
10,729.63
11,900.00
Darby, P. M.
22.
Ryden, L.
10,509.36
11,841.16
Huskins, W. E.
23.
Halstead, E.
10,406.74
11,566.44
Ruzicka, E.
24.
Greer, Z.
10,180.00
11,400.00
Schreiber, M. E.
25.
Zwick, L.
9,920.00
11,088.40
Lang, J. J.
Totals
$614,256.30
$623,202.53
*67 The following list shows patents listed in the name of Arthur and another person: Patent No.
Issued to Arthur and:
Title of product
2519215
N. A. Appleton
Rotary Snap Switch
2686216
N. A. Tornblom
Service Entrance Fitting
2847497
Tornblom & Lindell
Switchgear Mounting
2856452
N. Appleton & Tornblom
Sealing Means for Mineral
Insulated Cable Fittings
2917263
N. Appleton
Electrical Fixture Fastener
2964437
N. Appleton
Mineral Insulated Cable Fitting
2988591
Tornblom & Lindell
Sectional Switchgear Housing
3006664
N. Appleton
Self-Sealing Fitting for
Flexible Conduit
3213270
Lindell, Stephensen
Flood Lamp Fixture
The following shows a list of patents in effect in the year 1966 which were issued to other employees of petitioner: Patent No.
Issued to
Title
2467639
N. A. Tornblom
Box Cover with Fixture Support
2480522
N. A. Tornblom
Cable Clamp
2490286
N. A. Tornblom
Electrical Connector
2516096
N. A. Tornblom
Drain Fitting
2530135
N. A. Tornblom
Vented Explosion-Proof Lighting Fixture
2545124
N. A. Tornblom
Fixture Hanger for Outlet Boxes
2640912
N. A. Tornblom
Double Beam Auto Spotlight
2673259
N. A. Appleton, Richard
Locking Device for Pash Button Stations
Krause
2687904
N. Tornblom
Fitting for Flexible Conduit
2745912
I. Meyer
Take-Up Reel with Rel. Lock Device
2808631
N. A. Tornblom
Support Clamp for Cables
2822099
D. A. Duncan
Mtl. Handling Machine
2850202
K. O. Schneider, A. Wer-
Outlet Box and Method of Manufacturing Same
muth
2952488
N. A. Appleton
Closure Member for Conduit Fittings
2966327
N. A. Appleton
Fixture Hanger
3006661
E. A. McNeill
Cable Clamp for Connecting Boxes
3039717
N. A. Appleton
Locking Device for Take-Up Reel
3065925
N. A. Appleton
Take-Up Reel
3090259
J. Lang, S. Oman, J.
Method of Making Self-Sharpening Ledger Plates
Cronin
*68 Arthur submitted an affidavit, sworn to under date of July 20, 1961, to the Internal Revenue Service in connection with the proposal to disallow to petitioner a portion of the salary paid to him, which contained the following statements: I am the inventor named in the following Letters Patents of the United States which are identified as follows: Patent
Issued
No.
Date
Description
2,545,564
3/20/51
Fixture Hanger pie plate
2,622,756
12/23/52
Box Extension Right Slots
2,674,470
4/ 6/54
Electrical Connector and
method of Making Same
2,686,216
8/10/54
Service Entrance Fitting
2,687,757
8/31/54
Locknut for Electrical
Connectors
2,715,214
8/ 9/55
Detachable Terminal As-
sembly for Electrical
Lighting Fixture
2,726,372
12/ 6/55
Swivel Mounting for Elec-
trical Devices
2,747,758
5/29/56
Electrical Box and Mount-
ing Therefor
2,749,435
6/ 5/56
Lamp Guard Mounting
2,782,060
2/19/57
Separable Conduit Fitting
2,786,936
3/26/57
Explosion-proof Lighting
Unit
2,794,891
6/ 4/57
Explosion-proof Switch
Assembly
2,800,247
7/23/57
Closure Member
2,812,149
11/ 5/57
Mounting Clamp for
Switch Boxes and the
like
2,835,722
10/19/58
Drainable Enclosure for
Explosion - proof Elec-
trical Systems
2,847,497
8/12/52
Switch Gear Mounting
2,856,451
10/14/58
Fitting having Compound
Coupling Means for Use
with Mineral Insulated
Cable Fittings
*69 I invented the inventions described and claimed in the aforesaid Letters Patents and signed the Oath of Invention thereof, filed with the Applications on which said Letters Patents were issued. In addition to the patents listed above, I also have secured patents which issued after 1958, but which were filed in some instances three and four years prior to that time, and the Corporation produced and sold products on which I had patents applied for. A list of these patents, together with the sales generated, will be submitted at a later date. I am the owner of the entire right, title and interest in and to said Letters Patents and inventions covered thereby. N. A. Tornblom was employed by petitioner from 1920 until he retired in 1954. At the date of the trial of this case, Tornblom was deceased. The following schedule shows the compensation paid to Tornblom for the years indicated: Year
Compensation
1947
$24,753.26
1948
23,200.00
1949
18,700.00
1950
21,650.00
1952
19,600.00
1953
18,600.00
1954
10,334.09
Petitioner's net sales and net income or loss as shown by its tax returns for its fiscal years ended July 31, 1955, 1956, and 1958 were as follows: *70 Taxable
Net income
year ended
Net sales
or (loss)
July 31
per return
per return
1955
$19,466,462
$ 972,588
1956
22,914,936
1,390,872
1958
19,060,101
(2,032,204)
Petitioner's three principal competitors during the years here in issue were Crouse-Hinds Company, Syracuse, New York; Pyle-National Company, Chicago, Illinois; and Thomas & Betts Company, Elizabeth, New Jersey. The following schedule shows the amount of compensation paid by Crouse-Hinds Company and Thomas & Betts Company to various executives as shown in prospectuses filed by these companies with the Securities and Exchange Commission under dates of December 1, 1958 and February 25, 1959, respectively: Crouse-Hinds Company - for the fiscal year ended 9-30-58.
John R. Tuttle, Chairman, President and Treasurer
$90,967.07
Robert Sloan, Executive Vice-President
$58,545.63
E. R. Moreswath, Vice-President Sales
$38,754.62
A. F. Mills, Consultant (former president)
$32,450
William F. Hinds, Consultant (former Chairman of Board)
$39,675
Thomas & Betts Company - for the calendar year 1958.
George C. Thomas, Jr., Chairman and Treasurer
$60,855
N. J. McDonald, President and Director
$89,620
Robert Thomas, Jr., Vice-President and Director
$25,902
*71 The net sales and net income of Crouse-Hinds Company, Thomas & Betts Company, and Pyle-National Company for their calendar years 1955, 1956, and 1958 were as follows: Crouse-Hinds Company
Year
Net sales
Net income
1955
$28,173,000
$1,403,000
1956
35,197,000
2,884,000
1958
32,291,000
1,567,000
Thomas & Betts Company
1955
$14,838,000
$1,685,000
1956
18,334,000
2,553,000
1958
17,084,000
1,525,000
Pyle-National Company
1955
$10,351,000
$534,000
1956
9,986,000
532,000
1958
13,286,000
828,000
From 1950 throughout the years here involved and until the date of the trial in this case all of the outstanding capital stock of petitioner was owned by Arthur, his mother, and his sister, the ownership of each party being as follows: Number of Percentage
shares
of shares
Owner of stock
owned
owned
Arthur
151
60.4
Lillian C. Appleton
67
26.8
Edith Marie Priesmeyer
32
12.8
Total
250
100.0
Arthur, his mother, and his sister had each acquired their respective stock by purchase or gift prior to 1949. For the fiscal year ended July 31, 1955, petitioner agreed to a disallowance of $8,400 paid to Arthur's *72 sister, Edith Marie Priesmeyer as an excessive portion of salary paid to her for services performed by her during that year. For the fiscal years ended July 31, 1956 and 1958 petitioner agreed to the disallowance of salaries paid to Arthur's sister, Edith Marie Priesmeyer in the amounts of $8,400 and $9,950.04, respectively, as excessive amounts paid to her for services performed by her during those years. One of the patents which Arthur holds which does not relate to an item usable in petitioner's business involves a moving seat for an automobile. Arthur discussed this patent with representatives of the Ford Motor Company and received a bona fide offer from the Ford Motor Company for a royalty with respect to the use of this patent. In the prospectus of Crouse-Hinds Company, dated December 1, 1958, the statement is made that that company's key employees have stock option plans whereby they may purchase stock of the company in stated amounts and at stated prices. The prospectus contains the following statement with respect to patents: The Company owns numerous patents and patent applications and is licensed under others. While the Company considers that, in the aggregate, its *73 patents are important in the operation of its business, it does not consider that any one of its patents or any group of them is of such importance that termination would materially affect its business. The prospectus filed February 25, 1959 by The Thomas & Betts Company contained a statement entitled, "Development Expenses and Patents," which said, "Development expenses and costs of obtaining patents are charged to expense as incurred." This prospectus also contained the statement that the company followed the practice of extending to key personnel, including some of its officers and directors, "restricted stock options." In 1962 a suit for patent infringement was filed by Arthur and petitioner against Crouse-Hinds Company, one of its largest competitors. In the suit Crouse-Hinds Company was charged with infringement of the patents on "Detachable Terminal Assembly for Electrical Lighting Fixtures" and "Electrical Conduit Union and Expansion Coupling," items referred to as UNY, UNF, UNYL, and UNFL. In a counterclaim petitioner was charged with violating one of Crouse-Hinds trademarks. A settlement agreement was entered into between the parties whereby Crouse-Hinds Company agreed *74 to pay Arthur the sum of $25,000 and to cease the manufacture of the products which petitioner claimed violated Arthur's patents which it was using and petitioner agreed to cease the use of the name which Crouse-Hinds Company contended violated its trademark. The settlement was entered into on March 15, 1965. Crouse-Hinds Company furnished Arthur with a copy of a letter dated February 16, 1965, to it from Lybrand, Ross Bros. & Montgomery, Certified Public Accountants, estimating the total sales of lighting fixtures and union couplings, the manufacture of which by Crouse-Hinds CompanyArthur and petitioner contended violated Arthur's patents, to be $310,374 for the 4 years 1961 through 1964 and stating that even though the sales for the years 1955 through 1960 of $183,029 could not be verified, nothing had come to their attention to indicate that they were not fairly stated. During the years here in issue, Arthur had a sole proprietorship known as Appleton Oil Company to which he devoted some time on Saturdays and Sundays. This company's main address was at Tulsa, Oklahoma, and Arthur had a substantial investment in the company. Arthur estimated that the oil reserves of Appleton *75 Oil Company are worth several million dollars and that the properties of Appleton Oil Company in Oklahoma at the time of the trial of this case were producing over 1,000 barrels of oil a day. On his individual Federal income tax returns for the years 1956 through 1960, Arthur claimed the following losses from his oil business: Year
Amount of loss
1956
$129,128.19
1957
198,452.65
1958
213,036.01
1959
226,896.80
1960
198,865.72
$966,379.37
Petitioner's income tax returns for every year subsequent to the execution on July 8, 1946, of the contract between petitioner and Arthur have been examined by agents of the Internal Revenue Service. The representative of petitioner with whom the agents discussed their examination of petitioner's returns was Alvin Gertsenberger who has been employed by petitioner from 1943 and who had formerly been an internal revenue agent. At the conferences between respondent's agents and a representative of petitioner with respect to petitioner's returns, Arthur's salary was discussed. In certain years adjustments were agreed to between the revenue agent and representatives of petitioner. Thereafter petitioner would compute Arthur's *76 salary using the adjusted formula previously agreed to. For the years here in issue the salary paid to Arthur by Petitioner, deductions for which were claimed in the amounts of $256,718.54, $289,843.49, and $261,791.34 for the fiscal years ended July 31, 1955, 1956, and 1958, respectively, were computed on the basis of $60,000 plus 2 percent of sales in excess of $8,172,000 with a successive reduction of 1/4 percent on each $2,000,000 over the $14,000,000. This was in accordance with a formula agreed upon by the investigating revenue agent with representatives of petitioner in a prior year. In the original investigation by the revenue agents of petitioner's income tax returns for its fiscal years ended July 31, 1955, and July 31, 1956, the report of which was dated August 2, 1957, no adjustment was made in the amount of the deduction claimed by petitioner for salary paid to Arthur. Because of a loss in its fiscal year ended July 31, 1958, petitioner applied for a tentative loss carry-back adjustment for its fiscal years ended July 31, 1955, and July 31, 1956. In considering this application respondent re-examined petitioner's Federal income tax returns for its fiscal years ended *77 July 31, 1955, and July 31, 1956. For the fiscal year 1955 respondent disallowed all deductions for compensation to Arthur in excess of $100,000 for purposes of computing the income to be used in determining the portion of the loss carry-back from the fiscal year 1958 remaining to be carried over to the fiscal year 1956. Since the income for the fiscal year 1955 was not ultimately the applicable limitation on the amount to be carried over, we do not consider this disallowance to be in issue in this case. Respondent disallowed all compensation to Arthur in excess of $100,000 claimed by petitioner as a deduction for the fiscal year ended July 31, 1956, and for the fiscal year ended July 31, 1958 disallowed deductions for compensation to Arthur in excess of $100,000 for the purpose of determining the amount of petitioner's net operating loss carry-back from that year. For the fiscal year 1955 respondent did not incorporate into the tax computation any reduction in the deduction claimed by petitioner for officers' salaries but only those adjustments previously agreed to by petitioner and the reduction in net operating loss resulting from the disallowance in part of the salary paid by *78 petitioner to Arthur in the fiscal year ended July 31, 1958, apparently for the reason that any adjustment not previously agreed to and not related to the claimed net operating loss carry-back was barred by the statute of limitations, the statute for the fiscal year ended July 31, 1956, being open because of agreements previously entered into between the parties. Ultimate Fact The deductions claimed by petitioner for compensation paid to Arthur for the fiscal years ended July 31, 1956, and July 31, 1958, in the amounts of $289,843.49 and $261,791.34, respectively, represent reasonable compensation for the services rendered by Arthur to petitioner. Opinion Section 162(a)(1) of the Internal Revenue Code of 1954[1] provides for deduction as an ordinary and necessary business expense of a "reasonable allowance" for salaries paid for "personal services actually rendered." What is a "reasonable" allowance for the "services actually rendered" by an officer or employee is a question of fact to be determined from all the evidence. Numerous cases have listed the various *79 factors to be considered in making this determination. These factors as summarized in Capitol Market, Ltd. v. United States, 207 F. Supp. 376 (D.C.Hawaii, 1962), include the qualifications of the officer; the nature, extent and scope of the officer's work; the size and complexities of the business; comparison of the salaries paid by the particular taxpayer with its gross and net income; the prevailing economic conditions; comparison of salaries with the distributions to stockholders; the amount of compensation paid by comparable concerns for comparable work; the salary policy of the taxpayer as to all employees; and in certain circumstances the amounts paid to the officers in previous years. It has long been recognized that the deduction provided by section 162(a)(1) and predecessors of this section for a reasonable allowance for salaries or other compensation for personal services actually rendered requires that the payment not only be reasonable in amount but that it be paid as salary *80 and not be in substance a disguised dividend. R. J. Reynolds Tobacco Co. v. United States, 149 F. Supp. 889 (Ct. Cls., 1957). Under section 1.162-7(b)(2), Income Tax Regulations, and similar provisions of prior regulations, contingent compensation paid pursuant to a free bargain between the employer and the individual to whom the salary is paid made before the services are rendered may under certain circumstances, justify the allowance of a deduction, even though the amount paid to the employee under the contingent agreement is more than would ordinarily be paid. Where the contingent compensation agreement is made between a corporation and an individual who owns, or with his close relatives owns, the major portion of the stock of the corporation making the payment, it is necessary to determine whether the agreement is one which would be made between disinterested parties in considering the weight to be given to the fact that the payment was in accordance with an agreement for contingent compensation. No useful purpose would be served here by an extended discussion of the facts which we have set forth in some detail in our findings and of how *81 each of these facts bears upon the various elements to be considered in determining whether an amount paid to an officer is a reasonable salary. On the basis of all the facts here present, we agree with respondent that purely for executive services to the corporation, the amount paid to Arthur is excessive. The evidence shows that two of petitioner's competitors, one of which had sales and income during the years here in issue in excess of petitioner, and the other sales just slightly less and income in excess of petitioner, each paid a salary to its chief executive officer of around $90,000 plus a stock option plan. From this evidence it would appear that a salary of $100,000 a year would be adequate compensation to Arthur for the executive and administrative duties he performed for petitioner. Respondent argues that petitioner has failed to show that the officers of petitioner's competitors were not also holders of patents and inventors of products manufactured and sold by their companies. The fair inference from the statements with respect to patents and research and development expenses contained in the prospectuses filed by each of these companies with the Securities and Exchange *82 Commission, from which source the officers' salaries were also obtained is that the executive officers of petitioner's competitors did not hold patents on the products manufactured by their companies and that no portion of their salaries included payments made by their corporate employers for research and development work. The evidence in this case shows that Arthur's greatest service to petitioner was as an inventor. Of the 76 patents which Arthur had obtained, 21 were with respect to products manufactured by petitioner, and the products manufactured in accordance with Arthur's patents were the most profitable in petitioner's product line. Respondent makes some argument that the figures for sales and profits with respect to the products which were manufactured under Arthur's patents should not be accepted since they were not precisely accurate, but were to some extent estimates based on card records as distinguished from permanent records maintained by petitioner. In our opinion the estimates made by petitioner with respect to the sales and gross profits on products manufactured under Arthur's various patents are substantially accurate and certainly sufficiently accurate to use *83 as a basis of determining the value of Arthur's services as an inventor to petitioner. Respondent also attacks the method used by petitioner to establish the amount of reasonable royalty which might have been paid with respect to Arthur's various patents by petitioner had those patents been licensed to petitioner. Petitioner's evidence in this regard was the testimony of a patent attorney who had personally negotiated and drawn up a number of licensing agreements in connection with patents of the same general nature as Arthur's patents. From his testimony we are convinced that the range of royalties to which he testified would be a reasonable range and have so found. Respondent further questions the materiality of evidence as to the royalties petitioner might have paid had it licensed Arthur's patents, making the argument that under the "shop-rights" rule, petitioner would have had a right to a nonexclusive license to manufacture under all of Arthur's patents. If we assume respondent is correct in his interpretation with respect to petitioner's right under the "shop-rights" rule, it would nevertheless follow that Arthur's compensation should bear a relationship to his value to *84 petitioner as an inventor as well as his value to petitioner as a corporate executive. It is, however, Arthur's interpretation of his contract with petitioner whereby he agreed that he would "endeavor to create and develop certain patented devices to be manufactured by the Company as well as endeavor to make improvements upon articles heretofore created and developed by him, and will at all times act for the best interests of said Corporation," that petitioner had the right to the exclusive use of any patents he obtained with respect to the products it manufactured or devices in connection with the manufacture of such products. It is Arthur's interpretation that it would not be to the best interest of petitioner to permit competitors to manufacture under any of his patents unless such license to manufacture by a competitor were to petitioner's best interest. Arthur's interpretation of the agreement is to some extent supported by the fact that in the settlement of the litigation between Crouse-Hinds Company as one party and Arthur and petitioner as the other party, Crouse-Hinds Company agreed, among other things, to discontinue the manufacture of the products which petitioner and *85 Arthur contended violated Arthur's patents. The agreement between petitioner and Arthur made on July 8, 1946 with respect to the work as an inventor he was to do for petitioner and the use petitioner was to have of patents resulting from this work was certainly not as precise as might be expected in the case of a corporation dealing with an individual who owned no stock in that corporation and whose immediate family wholly owned no such stock. The detail which might be expected in an agreement between unrelated parties with respect to a corporation's use of inventions made by an employee is indicated in Roland Chilton, 40 T.C. 552 (1963). In our opinion, the lack of precision in the provisions of the contract between petitioner and Arthur does not cause the payments made by petitioner to Arthur to be unreasonable for the services Arthur rendered as an inventor since in fact petitioner did have exclusive use of 21 of Arthur's patents during the years here in issue. As respondent points out, the amount paid to petitioner was geared to overall sales and not to a percentage of sales of products manufactured under Arthur's patents or a royalty with respect to such patents. *86 This fact does not cause the amount not to be an ordinary and necessary business expense of petitioner if the amount computed on this basis is a reasonable amount for the services rendered by Arthur as an inventor. Even though Arthur was not paid a royalty the amount of a reasonable royalty which might have been required to have been paid by petitioner for use of Arthur's inventions is some indication of the value of Arthur's services to petitioner as an inventor. Considering all the facts here present and the unusual situation of the chief executive officer and major stockholder of petitioner also being an inventor of such ability as to have obtained numerous valuable patents, some of which were with respect to the most profitable products manufactured by petitioner, we have concluded that the amounts paid by petitioner to Arthur were reasonable for his services as chief executive officer and inventor. Petitioner argues that some weight should be given to the fact that the contract between petitioner and Arthur had been in effect for a number of years, that petitioner's income tax returns for each of these years had been investigated by respondent's agent with only minor adjustments *87 being made by the agents in the deduction allowed petitioner for Arthur's salary. Arthur's salary had been discussed by representatives of petitioner and representatives of respondent in each year. We included a finding in this regard in our findings of fact since in some cases comparable facts have been held to have some materiality. However, the fact that no substantial disallowance of Arthur's salary had been made in prior years would be of little weight on the issue of the reasonableness of the salary paid to Arthur in the years here in issue in this particular case were it not for the facts showing the payments in fact to be reasonable considering Arthur's services to petitioner as an inventor. Likewise, we have not overlooked respondent's arguments with respect to the lack of the payment of dividends by petitioner or the fact that in 3 years there had been disallowances by respondent agreed to by petitioner of amounts of salary paid to Arthur's sister who was also a stockholder in petitioner on the ground that the amounts paid to her were excessive for the services she performed. However, as petitioner points out, Arthur's mother owned more stock in petitioner than did his *88 sister and there had been no disallowance of payments to her in any year or in fact any indication that any payments to her had been made by petitioner. Petitioner has offered substantial evidence supporting the reasonableness of the payments made to Arthur for his services to petitioner as an inventor, and respondent has offered no evidence to the contrary, all of respondent's evidence going to the value of Arthur's services to petitioner as a chief executive officer and the high degree of scrutiny necessary in determining the reasonableness of payments by a corporation to an officer who is also its major stockholder. Respondent does make some attacks on Arthur's credibility as a witness. The Court heard and observed Arthur on the witness stand and considered him to be a straightforward witness whose factual testimony was accurate to the best of his recollection. Insofar as Arthur's testimony dealt with opinion the Court has weighed his opinion along with the other evidence in the case and with due consideration to Arthur's obvious interest in the outcome of the case. After consideration of Arthur's testimony, the testimony of petitioner's expert witness with respect to the royalties *89 normally paid in connection with certain patents and the factual testimony of other witnesses produced by petitioner with respect to the superiority of petitioner's products occasioned by certain features of the products which were covered by Arthur's patents, we have concluded that petitioner has established that the amounts which it paid to Arthur in the fiscal years ended July 31, 1956 and July 31, 1958, were reasonable and were properly deductible by it as ordinary and necessary business expense. Because of other adjustments made in the notice of deficiency which were not contested by petitioner, Decision will be entered under Rule 50. Footnotes
1. Also treasurer during 1955. ↩
2. Assistant to President during 1955.↩
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩